**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

KARL K. KNIGHT, II,

      Plaintiff

v.

DJUKIC, et. al.,

      Defendants

Case No.: 3:19-cv-00114-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 43

      This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

      Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 43, 43-1 to 43-15, 44 (notice of manual filing of DVD), 51 (notice of manual filing of CD).) Plaintiff filed a response. (ECF No. 47.) Defendants filed a reply. (ECF Nos. 52, 52-1, 52-2.)

      After a thorough review, it is recommended that Defendants' motion be denied.

**I. BACKGROUND**

      Plaintiff is an inmate who is currently in the custody of the Federal Correctional Institution Herlong, and is proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 6.) The events giving rise to this action took place while Plaintiff was a pretrial detainee at the Washoe County Detention Facility (WCDF).

      The court screened the complaint and allowed Plaintiff to proceed with an excessive force claim under the Fourteenth Amendment as well as a retaliation claim under the First Amendment against defendants Nicholas Simcox and Ibrica Djukic. (ECF No. 5.)

Plaintiff alleges that on December 9, 2018, he questioned officers about a write-up that he believed was excessive and threatened to file a grievance, and Defendants became very hostile and aggressive. They told Plaintiff to go to his cell, and when he proceeded to do so, Defendants grabbed him by the arms and started pushing him. Plaintiff said he was going, and Simcox squeezed his arm hard. Djukic said, "get him!" and grabbed Plaintiff in a chokehold from behind and severely choked him. Simcox grabbed Plaintiff's head and face in a headlock and started twisting and pulling in the opposite direction as Djukic was still choking him. Simcox put Plaintiff in a headlock and caused Plaintiff to fear for his life because he was unable to breathe and felt himself blacking out. Djukic was holding Plaintiff's legs while Simcox was choking him, with both deputies putting all their weight on Plaintiff.

Plaintiff was able to take a breath and asked why he was being choked, and Simcox said, "Shut up! Quit resisting!" and smashed Plaintiff's face into the concrete floor. He was face down and was allowing the deputies to handcuff him, and was not resisting. Simcox then dropped onto Plaintiff's shoulder with his knee and put all his weight into it. Simcox then grabbed Plaintiff's arm and bent it at an angle, causing Plaintiff to scream out in agony. Plaintiff was not resisting. After he was restrained, he was taken to medical and had a bloody nose, bruises, and lacerations to his face and chin. Both arms were scraped raw and his shoulder was very bruised and painful. His hip was sore where he has a hip replacement. Plaintiff believes this was done in retaliation for him telling the officers he was going to file a grievance against them.

Defendants move for summary judgment, arguing that Plaintiff's retaliation and excessive force claims fail, and alternatively, that they are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

1 determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

2 *Anderson*, 477 U.S. at 249.

3          In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

4 "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

5 come forward with evidence which would entitle it to a directed verdict if the evidence went

6 uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

7 the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

8 *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

9 omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

10 defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

11 an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

12 party cannot establish an element essential to that party's case on which that party will have the

13 burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

14          If the moving party satisfies its initial burden, the burden shifts to the opposing party to

15 establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

16 *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

17 dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

18 be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

19 *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

20 (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

21 by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

22 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

23

1  pleadings and set forth specific facts by producing competent evidence that shows a genuine

2  dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

3                                    **III. DISCUSSION**

4  **A. Excessive Force**

5          **1. Legal Standard**

6          "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force

7  that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989).

8          In determining whether force used against a pretrial detainee is excessive, the court

9  utilizes an objective standard. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). That is, the

10 court must determine whether the force used was objectively unreasonable. *Id*. "[O]bjective

11 reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting

12 *Graham*, 490 U.S. at 396). "A court must make this determination from the perspective of a

13 reasonable officer on the scene, including what the officer knew at that time, not with the 20/20

14 vision of hindsight." *Id*. "A court must also account for the 'legitimate interests that stem from

15 [the government's] need to manage the facility in which the individual is detained,' appropriately

16 deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve

17 internal order and discipline and to maintain institutional security.'" *Id*. (quoting *Bell v. Wolfish*,

18 441 U.S. 520, 540 (1979)). The following is a non-exhaustive list of considerations that "may

19 bear on the reasonableness or unreasonableness of the force used":

20              The relationship between the need for the use of force and the
                amount of force used; the extent of the plaintiff's injury; any effort
21              made by the officer to temper or limit the amount of force; the
                severity of the security problem at issue; the threat reasonably
22              perceived by the officer; and whether the plaintiff was actively
                resisting.
23
   *Id*. (citing *Graham*, 490 U.S. at 396).

### 2. Facts and Argument

Defendants maintain that they did not use excessive force and instead used only that force that was reasonably necessary in response to Plaintiff's escalating conduct.

According to Defendants, Plaintiff was housed in Unit 7 of the WCDF, which is a maximum security unit housing the most violent individuals. (Djukic Decl., ECF No. 43-1 ¶¶ 2, 4; Simcox Decl., ECF No. 43-4 ¶ 2; 43-2.) Djukic observed Plaintiff gambling on December 3, 2018, which is against WCDF rules. (*Id.* ¶¶ 3, 5.) The same day, poker chips created from torn playing cards were found in Plaintiff's cell. (ECF No. 43-2.) Djukic gave Plaintiff a verbal warning regarding gambling. (Djukic Decl., ECF No. 43-1 ¶ 5.) On December 9, 2018, Plaintiff was observed again playing poker in the Unit 7 dayroom by Djukic. (*Id.* ¶ 6; ECF No. 43-2; ECF No. 43-3.) Simcox took control of the unit's deputy station while Djukic performed cell searches. (Djukic Decl., ECF No. 43-1 ¶ 7; Simcox Decl., ECF No. 43-4 ¶ 3.) Djukic uncovered handmade poker chips in Plaintiff's cell, and returned to the deputy station. (Djukic Decl., ECF No. 43-1 ¶ 7.)

Djukic discussed the impermissible gambling with Plaintiff and asked Plaintiff what the punishment should be. (Djukic Decl., ECF No. 43-1 ¶ 7; Simcox Decl., ECF No. 43-4 ¶ 4.) In response, Plaintiff said a verbal warning. (*Id.*) Since the previous verbal warning for the same behavior did not work, Djukic said it would be more than a verbal warning. (*Id.*) Djukic instructed Plaintiff he would receive a 23-hour lockdown. (*Id.*, ECF No. 43-2.) Plaintiff disputed that his behavior warranted this punishment. (*Id.*)

Djukic instructed Plaintiff to go to his cell on the second floor for lockdown. (Djukic Decl., ECF No. 43-1 ¶ 8; Simcox Decl., ECF No. 43-4 ¶ 5.) Stairs to the second floor are located near the deputy station. (*Id.*) Instead of proceeding to his cell, Plaintiff said he would file a

grievance. (*Id.*) Plaintiff walked away from the stairs. (*Id.*) Based on his noncompliance with the instruction to go to his cell, Djukic and Simcox took a light hold of each of Plaintiff's arms and escorted him up the stairs towards Plaintiff's cell. (Djukic Decl., ECF No. 43-1 ¶ 9, Simcox Decl., ECF No. 43-4 ¶ 6.) This amount of force was needed to safely escort a verbally and physically defiant, maximum security inmate up the stairs to his cell. (*Id.*)

At the top of the stairs, Plaintiff jerked his right arm out of Simcox's grasp. (Djukic Decl., ECF No. 43-1 ¶ 9, Simcox Decl., ECF No. 43-4 ¶ 6.) Djukic placed Plaintiff in a harness position, his right arm over Plaintiff's shoulder and left arm under Plaintiff's armpit, and verbally commanded Plaintiff to go to his knees. (*Id.*) Djukic repeated his command for Plaintiff to go to his knees at least two more times. (*Id.*) Instead, Plaintiff stiffened his legs and widened his stance, resisting placing his knees on the ground. (*Id.*) Simcox, while grasping Plaintiff's arm with his left hand, used his right hand on Plaintiff's head to move Plaintiff to his knees. (*Id.*; ECF o. 42-3.) Djukic then placed Plaintiff in a harness position, bumping his hips into Plaintiff to get Plaintiff to the ground. (Djukic Decl., ECF No. 43-1 ¶ 9, Simcox Decl., ECF No. 43-4 ¶ 6; ECF No. 43-3.) On the ground, Plaintiff was immediately restrained. (*Id.*) The entire altercation lasted approximately 40 seconds. (Djukic Decl., ECF No. 43-1 ¶ 9, Simcox Decl., ECF No. 43-4 ¶ 6.)

Within seconds, additional deputies arrived to assist. (Djukic Decl., ECF No. 43-1 ¶ 10; Simcox Decl., ECF No. 43-4 ¶ 7.) Plaintiff stated he was injured, and was immediately taken to the infirmary. (ECF No. 43-2; Schifferdecker Decl., ECF No. 43-6 ¶ 2.)[1] Following the altercation, Plaintiff had a few reddened areas on his body and some scrapes on both arms. (Schifferdecker Decl., ECF No. 43-6 ¶ 3; ECF No. 43-7.) Photographs show minor red marks

---

[1] Nicole Schifferdecker is a Registered Nurse who was working in the infirmary at WCDF when Plaintiff was brought in after the incident. (Schifferdecker Decl., ECF No. 43-6 ¶¶ 1, 2.)

and scratching. (ECF No. 43-8.) Plaintiff had a bloody nose that subsided by the time he was in

the infirmary. (Jonathan Ching Decl., ECF No. 43-10 .)[2] He declined the nurse's offers of ice and

Tylenol/ibuprofen. (Ching Decl., ECF No. 43-10 ¶ 3; Schifferdecker Decl., ECF No. 43-6 ¶ 3;

ECF No. 43-7; ECF No. 52-1.)

Defendants assert that while in the infirmary, Plaintiff recapped the altercation, and said

he was not worried about abiding by the rules and commands regarding gambling because he

was in for bank robbery and housed with "real killers." He referred to the deputies in a

derogatory fashion, and acknowledged resisting Defendants. (ECF No. 52-1.)

The use of force was reviewed by Sergeant Matthew Durham. (Durham Decl., ECF No.

43-14; ECF No. 43-15) Durham viewed the video footage and written reports and determined the

use of force was justified based on Plaintiff's failure to follow verbal commands and his jerking

away from Simcox's hands. (*Id*.)

Defendants argue that they began the interaction with nonphysical verbal commands,

which Plaintiff defied. Then, they applied light force in the form of a physical escort. When

Plaintiff jerked away, Djukic responded with a harness hold and gave a verbal command for

Plaintiff to go to his knees, which he repeated at least two more times and then bumped his hips

into Plaintiff to attempt to get him to the ground. The incident lasted approximately 40 seconds.

Defendants contend that when Plaintiff jerked his arm away, they were standing at the

top of stairs and Defendants feared for their safety and being pushed down the stairs. They

reasonably believed Plaintiff was trying to get away and preparing to fight, giving rise to a

security threat. They had background information that Plaintiff was housed in a maximum

---

[2] Jonathan Ching is a deputy at the Washoe County Sheriff's Office who responded to Unit 7 where Defendants had Plaintiff restrained, and escorted Plaintiff to the infirmary. (Ching Decl., ECF No. 43-10 ¶¶ 1-2.)

security unit, reserved for inmates known to engage in violence or those charged with especially heinous crimes.

According to Plaintiff, the video shows that he was following orders to return to his cell on his own, when Defendants followed him to the stairs and grabbed him by the arms and started pushing him up the stairs. At the top of the stairs, Plaintiff claims that Simcox squeezed his right arm hard, causing Plaintiff to pull his arm away by reflex. At that point, Djukic said, "get him" and started choking Plaintiff from behind in a chokehold. Simcox then attacked Plaintiff's head, face and neck in a front-facing headlock. At some point Djukic let go and this allowed Simcox to engage Plaintiff in a headlock chokehold that was extremely tight. Plaintiff could not breathe and feared for his life. He was finally able to free his neck, and said, "Why are you choking me?" The response was: "Shut up, quit resisting." Defendants then shoved his face into the concrete causing Plaintiff's nose to bleed. Djukic then stood up and dropped his knee onto Plaintiff's shoulder putting all of his 260 pounds of weight onto it. Then, even though he was already handcuffed, Simcox bent his arm at a painful angle causing Plaintiff to scream out.

Plaintiff was taken to medical where he said he was choked by two deputies and his neck hurt. He had a bloody nose, bruises and scrapes on his face and body, and under his chin, as well as a raw spot on his back and a sore hip.

Plaintiff argues that he was complying with orders, and it was Defendants who escalated the situation by pushing him up the stairs. He claims he posed no security threat as he was going to his cell as instructed. He had to struggle to free himself from being choked.

In their reply, Defendants assert that the video shows Plaintiff walking away from the stairs, and then all three walking up the stairs at the same pace. They claim that the video does

1    not show their hands around Plaintiff's neck, or a chokehold being used. They provide the

2    transcript of Plaintiff's interview with Deputy Ching following the incident. (ECF No. 52-1.)

3         Plaintiff reported to Deputy Ching that he was choked unnecessarily, and received

4    injuries to his neck, hip, face and right arm. (ECF No. 52-1 at 4-8.) He said that after he asked if

5    he could write a grievance, they told Plaintiff to go to his cell, and when he started walking there

6    by himself, they grabbed his arms, and when they grabbed them tighter he "flexed" and then they

7    tried to take him down and he resisted. (ECF No. 52-1 at 10, 17 22, 23.) When Deputy Ching

8    said that (resisting and flexing) was a "bad play," Plaintiff replied that one of them was choking

9    him and the other was trying to tackle him. (*Id*.)

10    **3. Analysis**

11         Preliminarily, Defendants assert that Plaintiff did not support his opposition with

12    sufficient evidence, stating that he cannot create a genuine dispute of material fact by simply

13    making assertions in legal memoranda or by using conclusory and speculative testimony.

14         The court generally agrees with this as an accurate statement of law; however, Plaintiff's

15    statement of facts in his opposition largely tracks the allegations of his complaint, which is

16    verified under penalty of perjury. (*See* ECF No. 6 at 11.) "A verified complaint may be used as

17    an opposing affidavit under Rule 56." *Schroeder v. McDonald,* 55 F.3d 454, 460 (9th Cir. 1995)

18    (citing *McElyea v. Babbit*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam)). "To function as

19    an opposing affidavit, however, the verified complaint must be based on personal knowledge and

20    set forth specific facts admissible in evidence." *Id.* (citing Fed. R. Civ. P. 56(e); *McElyea*, 833

21    F.2d at 197; *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)).

22         Therefore, to the extent the assertions are based on personal knowledge and are

23    admissible, they may serve to oppose the motion and create a genuine dispute of material fact.

Plaintiff's assertions consist of his account of the incident, and therefore, are based on personal knowledge. In addition, many of Plaintiff's assertions are corroborated by his statements to Deputy Ching reflected in the audio as well as the transcript of the interview. (ECF Nos. 51, 52-1.)

The parties have diverging versions of what occurred on December 9, 2018.

The court has reviewed the video of the incident, which has no audio, and concludes that it could seemingly support either side's version of events. The video footage shows Plaintiff talking with Defendants. Plaintiff starts to walk toward the stairs, and then points toward the center of the room where he claims the grievance kiosk is located. Plaintiff walks a few steps toward the center of the room, and then stops and walks toward the stairs as Defendants approach him while pointing toward the stairs. Near the bottom of the stairs, Defendants each take hold of one of Plaintiff's arms and escort Plaintiff up the stairs. Plaintiff claims they were pushing him up the stairs, which Defendants dispute; however, it is unclear from the video what kind of force Defendants were using as they escorted Plaintiff up the stairs.

When they approached the top of the stairs, Plaintiff can be seen jerking his right arm up and away. Defendants claim this was an attempt to evade them, while Plaintiff says it was done reflexively when the Defendant holding that arm tightened his grip. A struggle then ensues. Defendants maintain that a "harness" hold was utilized, but it appears that one of the Defendants does put Plaintiff's head into a headlock-type hold. The other officer puts his arm around Plaintiff's head and pulls it down sharply in an apparent attempt to bring Plaintiff to the ground. The struggle continues as Defendants bring Plaintiff to the ground and then additional officers arrive. It is during this last part that Plaintiff claims one of the Defendants drove his knee and all

11

his weight into Plaintiff, and pushed his face into the concrete. The court cannot ascertain from the video footage whether or not this occurred.

According to Defendants, they only used that amount of force necessary to gain Plaintiff's compliance to return him to his cell and escalated that force to respond to his resistance and attempt to get away from Defendants. Plaintiff, on the other hand, asserts that he was complying with their instructions, and only jerked his arm away reflexively when too much force was used, and he was then put in a chokehold and struggled to free himself so he could breathe, and then had a knee driven into his body and his head slammed into the concrete.

Defendants assert that Plaintiff received minimal injuries and refused offers of ice and over the counter pain relievers; however, the evidence demonstrates that Plaintiff had a bloody nose, scratches and scrapes on his body, and complained of neck and hip pain. While he declined ice and pain medications, he did ask to have his neck checked out and the nurse confirmed that it was red.

Defendants maintain that they repeatedly commanded Plaintiff to comply and go to his knees, but he continued to resist. Plaintiff contends that he always complied with commands, and was not commanded to go to his knees.

Defendants claim that they acted reasonably in response to Plaintiff's refusal to go up the stairs to his cell, and then his jerking his arm away and continued resistance. Plaintiff is adamant that he posed no security risk as he was trying to go to his cell on his own and did not resist, but instead was struggling to writhe free in order to breathe.

Again, Defendants contend that they perceived a reasonable threat to their safety as well as to that of other inmates when Plaintiff tried to elude them and when he continued to resist. Plaintiff disputes this was the case.

The foregoing demonstrates the existence of a genuine dispute as to various material facts concerning whether Defendants' use of force was objectively reasonable. Therefore, Defendants' motion for summary judgment should be denied as to the excessive force claim.

**B. Retaliation**

    **1. Legal standard**

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id*. (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

    **2. Facts and Argument**

Defendants assert that Plaintiff received disciplinary orders prior to asserting he wished to file a grievance, and Djukic did not allow Plaintiff to file a grievance immediately after he received his disciplinary orders. (Djukic Decl., ECF No. 43-1 ¶ 11; Simcox Decl., ECF No. 43-4 ¶ 8.) Djukic determined Plaintiff's assertion was an effort to avoid disciplinary orders and control the situation. (*Id*.) In WCDF, the standard method to file a grievance is through a kiosk in the unit's common area. (Djukic Decl., ECF No. 43-1 ¶ 12.) Handwritten grievances are

1  unavailable to inmates in lockdown. (*Id.*) Djukic assessed that Plaintiff could file an electronic

2  grievance once he served his 23-hour lockdown. (Djukic Decl., ECF No. 43-1 ¶ 11.) Djukic's

3  practice is to allow inmates in lockdown to obtain assistance to file a handwritten grievance only

4  for something potentially life-threatening. (Djukic Decl., ECF No. 43-1 ¶ 14.) Otherwise, an

5  inmate can file grievances through the kiosk once he is out of lockdown. (*Id.*) Plaintiff was able

6  to and did file grievances after the incident, including on January 2, 4, and 22, 2019, two of

7  which were about the December 9, 2018, altercation. (ECF No. 43-11.) Plaintiff also submitted a

8  written statement regarding the altercation. (ECF No. 43-13.)

9        Defendants argue that a temporary delay in processing a grievance and the refusal to file

10  a single grievance does not constitute retaliation, citing cases from district courts in New York

11  and Maine. (ECF No. 43 at 9-10.)

12        Defendants further contend that it is unclear what adverse action is alleged. The screening

13  order suggests it may be the use of force that occurred after Plaintiff asserted that he wished to

14  file a grievance, but they contend that the complaint could be construed to allege that the

15  lockdown disciplinary order, the use of force or inability to immediately file a grievance were

16  adverse actions. They argue that the delay in filing the grievance is not adverse action.

17        Next, Defendants contend there is no causal connection between Defendants' actions and

18  the content of Plaintiff's statement he wished to file a grievance. They contend that the use of

19  force did not occur because of Plaintiff's assertion that he wished to file a grievance. (Djukic

20  Decl., ECF No. 43-1 ¶ 16; Simcox Decl., ECF No. 43-4 ¶ 9.) Instead, their actions occurred due

21  to Plaintiff's continued noncompliance and physical escalation. (*Id.*) They would have escorted

22  Plaintiff to his cell regardless of what Plaintiff said he was going to do. (*Id.*) In addition, the use

23  of force occurred only after Plaintiff jerked his arm out of Simcox's grasp. (*Id.*)

Defendants also argue that Plaintiff was not chilled because he filed grievances on January 2, 4, 22, 2019, and on September 9, 2019.

Finally, Defendants contend that their actions reasonably advanced a legitimate penological interest of maintaining safety and order within the facility. The delay in permitting him to file an electronic grievance was due to the disciplinary order. (Djukic Decl., ECF No. 43-1 ¶ 17; Simcox Decl., ECF No. 43-4 ¶ 10.) According to Djukic, if inmates were permitted to immediately file grievances while receiving disciplinary orders, the facility could not efficiently function and inmates would be in control of the disciplinary dynamic. (*Id.*) Defendants contend that the legitimate penological goal of maintaining order was advanced by requiring Plaintiff to wait 23 hours before filing a grievance. (*Id.*) In addition, the use of force advanced the legitimate penological interests of preservation of internal order and discipline. Plaintiff walked away from the stairs and was not compliant with the disciplinary order. Then, he jerked his arm away and increased force became necessary. Allowing inmates to disobey their commands would disrupt order within the facility's housing units. In addition, an inmate pulling away from a deputy escort puts the deputy's and other inmates' safety at risk. (Djukic Decl., ECF No. 43-1 ¶ 18; Simcox Decl., ECF No. 43-4 ¶ 11.)

According to Plaintiff, he was asked what he thought the punishment should be for playing poker, and he responded it should be a verbal warning because he had no prior writeups or verbal warnings. Defendants told him he was getting a 23-hour lockdown. Plaintiff viewed this as excessive and said, "Ok, I'm going to write a grievance." He claims that he then started walking towards the kiosk in the common area to complete the grievance. At that point, Defendants became hostile and aggressive and rushed toward Plaintiff saying, "No you're not, you will go to your cell." Plaintiff said "okay" and started walking toward his cell upstairs. Then

1  Defendants came toward him aggressively, took hold of his arm and started pushing him up the

2  stairs toward his cell and the struggle began.

3       This is corroborated in his interview with Deputy Ching, where Plaintiff said they told

4  Deputy Ching he was going to be punished with 23-hours of lockdown, and he said, "Can I write

5  a grievance?" Then Defendants both approached him "all puffed up" and told him to go to his

6  cell. Plaintiff started to go to his cell when they grabbed him and the altercation ensued. (ECF

7  No. 52-1 at 10:10-19, 17, 23.)

8       Plaintiff argues that he was attacked and choked by Defendants for attempting to file a

9  grievance about receiving excessive punishment for gambling. The grievance procedure says that

10 inmates should be able to file a grievance (ECF No. 47 at 19); therefore, his rights were chilled

11 when Defendants refused his right to do so. He argues that there was no legitimate penological

12 interest in Defendants attacking him for attempting to file a grievance.

13      **3. Analysis**

14      Preliminarily, the screening order indicated that the adverse action was the use of force

15 after Plaintiff told Defendants he was going to file a grievance.

16      First, there is a dispute as to whether Defendants used force against Plaintiff because of

17 his protected conduct. An inmate must submit evidence, either direct or circumstantial, to

18 establish a link between the exercise of constitutional rights and the allegedly retaliatory action."

19 *Pratt*, 65 F.3d at 806-07. Proximity in time between the protected speech and the alleged

20 retaliatory conduct is one form of circumstantial motive evidence. *McCollum v. Cal. Dep't of*

21 *Corr. and Rehab*, 647 F.3d 870, 882 (9th Cir. 2011) (citation and quotation marks omitted).

22      Defendants maintain that they did not use force against Plaintiff because he asked to file

23 a grievance. Instead, they claim that they used force because of Plaintiff's conduct of jerking his

arm away and continuing to resist. Plaintiff points out that they approached him aggressively and then used force against him almost immediately after Plaintiff said he was going to file a grievance about what he viewed as excessive punishment. He stated to Deputy Ching that as soon as he said that and started walking toward the grievance kiosk, Defendants approached him "puffed" up and aggressively. They told him to go to his cell, and when he started going, they went and grabbed him and choked him and took him down to the ground.

There is also a dispute as to whether Plaintiff's First Amendment rights were chilled as a result of Defendants' conduct. Defendants contend that Plaintiff's exercise of his First Amendment rights was not chilled because he continued to file grievances after the incident. Plaintiff claims his rights were chilled when he was attacked after he said he was going to file a grievance.

"[A]n objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting *Rhodes*, 408 F.3d at 568-69). "To hold otherwise 'would be unjust' as it would 'allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 569).

Viewing the facts in the light most favorable to Plaintiff, as the court must on summary judgment, Plaintiff has proffered evidence that Defendants used force against him after he said he was going to file a grievance. Objectively speaking, this would chill a person of ordinary firmness from future First Amendment activities.

Finally, there is also a dispute as to whether Defendants' conduct was furthering a legitimate correctional goal. Defendants contend that their conduct in restraining Plaintiff advanced the legitimate goal of maintaining safety and security of the facility. According to Plaintiff, he was not resisting and the force used was excessive, and so their action of using force against him was not advancing a legitimate correctional goal.

In sum, there are genuinely disputed facts that preclude the entry of summary judgment in Defendants' favor on the retaliation claim.

**C. Qualified Immunity**

The qualified immunity analysis consists of two steps: (1) viewing the facts in the light most favorable to the plaintiff, did the defendant violate the plaintiff's rights; and (2) was the right clearly established at the time the defendant acted. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc), *cert. denied*, 137 S.Ct. 831 (Jan. 23, 2017) ; *see also Hines v. Youseff*, 914 F.3d 1218, 1228-29 (9th Cir. 2019).

Taking the facts in the light most favorable to Plaintiff, Defendants utilized excessive force against Plaintiff when he was not resisting, and without a legitimate penological justification, and as a result he suffered injuries. It was clearly established at the time this occurred that the use of force against a pretrial detainee that is objectively unreasonable violates the Constitution. *See Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015).

With respect to the retaliation claim, viewing the facts in the light most favorable to Plaintiff, Defendants used excessive force against Plaintiff after he said he was going to file a grievance. It was clearly established that there is a constitutional right to pursue grievances when this claim arose. Therefore, Defendants are not entitled to qualified immunity on the retaliation claim. *Entler v. Gregoire*, 872 F.3d 1031, 1041-42 (9th Cir. 2017).

18

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Defendants' motion for summary judgment (ECF No. 43).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: December 23, 2020

_____
William G. Cobb
United States Magistrate Judge